ULTRACUTS LTD.; Ultracuts Franchises, Inc.
*v.* WAL-MART STORES, INC.;
Wal-Mart Stores Canada, Inc.

00-593                                                33 S.W.3d 128

Supreme Court of Arkansas
Opinion delivered December 14, 2000

*Everett Law Firm,* by: *David D. Stills* and *John C. Everett*; and *Shemin Law Firm,* by: *Kenneth R. Shemin,* for appellants.

*Ranae Bartlett, Jon B. Comstock,* and *Stephanie Gordon,* for appellees.

ANNABELLE CLINTON IMBER, Justice. This appeal arises from an order of the Circuit Court of Benton County granting summary judgment to the appellees, Wal-Mart Stores, Inc., and Wal-Mart Canada, Inc. Appellants, Ultracuts Ltd., and Ultracuts Franchises, Inc., argue on appeal that the trial court

improperly granted summary judgment, dismissing their claims of breach of contract and fraud, because questions of fact remained to be decided. Ultracuts further argues that the trial court improperly granted Wal-Mart's motion to strike Ultracuts' second amended complaint. Wal-Mart argues that summary judgment was properly granted and that the second amended complaint was properly dismissed.

The Ultracuts appellants are Canadian corporations operating hair salons throughout western Canada and the United States. The Wal-Mart appellees are retail organizations headquartered in Bentonville, Arkansas.

In 1994, Wal-Mart acquired all of the assets of Woolworth Canada, Inc., thereby gaining possession of 122 Woolco department stores, forty-three of which were located in western Canada, an area in which Ultracuts was a widely recognized leader in hair salon operations. Ultracuts alleged that its president, Meril Rivard, was contacted in 1995 by a realtor about the possibility of placing Ultracuts salons within Wal-Mart stores throughout western Canada. When Mr. Rivard expressed his interest in such an arrangement, Brad Messer, Wal-Mart's international property manager at that time, forwarded four lease agreements to him. In September 1995, Mr. Rivard signed and returned a lease agreement for Wal-Mart store number 3116 in Grant Park, Winnipeg, Manitoba. Mr. Rivard became concerned, however, when the manager of the Grant Park Wal-Mart indicated that he would not honor the lease. Also within this same time period, Mr. Rivard had a conversation with Brian Luborsky, the president of a rival hair salon business called Magicuts. Mr. Luborsky informed Mr. Rivard that Magicuts was going to be placing salons within Wal-Mart stores in western Canada.

Concerns over these developments prompted Mr. Rivard to travel to Bentonville for a meeting with Mr. Messer on October 12, 1995. Mr. Rivard testified by deposition and affidavit that during this meeting Mr. Messer entered into an oral contract, termed the "Ultracuts Agreement," on behalf of Wal-Mart in order to assuage Mr. Rivard's concerns about doing business with Wal-Mart. In the Ultracuts Agreement, the two parties purportedly agreed that:

1. Ultracuts would occupy certain of the newly acquired Wal-Mart stores in Western Canada as a licensee of the defendants for purposes of operating a hair salon business in such stores;

2. Wal-Mart would not place any other operator of a hair salon business in its stores in western Canada without first granting to Ultracuts the right to enter into a license agreement to occupy such stores; and,

3. Wal-Mart would not enter into a business relationship with any hair salon business other than Ultracuts within any market in which Ultracuts operates a hair salon business within one of the newly acquired Wal-Mart stores.

Because his concerns had been addressed, Mr. Rivard testified that he then signed the three remaining lease agreements and delivered them to Mr. Messer for execution. Ultracuts then began expending large amounts of capital in preparation for entry into several Wal-Mart stores in western Canada. Mr. Messer denied entering into the oral contract described by Mr. Rivard.

On February 8, 1996, Ultracuts and Wal-Mart executed a "License Agreement" to be effective as of January 22, 1996, pertaining to the operation of Ultracuts' hair salons inside stores operated by Wal-Mart Canada, Inc. The terms of the License Agreement specifically set out the rights and responsibilities of each party, including such issues as who will maintain and repair the premises, the right of access to the premises, the hours during which the Ultracuts salons will operate, the amount of insurance coverage to be maintained by Ultracuts, the type of business to be conducted in the licensed premises, the duration of the contract, and the terms of cancellation, renewal, and default. The amount of the monthly license fee to be paid by Ultracuts is specified on a store-by-store basis in the attached License Schedule, which is incorporated into the contract by its terms. Although only four Wal-Mart stores are designated as Licensed Premises in the License Schedule attached as Schedule "A," the License Agreement anticipates other Licensed Premises being added to the agreement in the future. According to the terms of the contract, additional retail premises may be added to the agreement by executing a New Store License Schedule, which is attached to the License Agreement as Schedule "B" and incorporated into the contract by its terms. The License Agreement contains no provision granting Ultracuts the right of first refusal to

license any space in Wal-Mart stores in western Canada in the future; nor does it contain any promise by Wal-Mart not to place Ultracuts' competitors in Wal-Marts within the same market. The License Agreement does provide, in paragraph 22.01, that:

> This Agreement constitutes the entire agreement between the parties regarding this Licensee's use of the Licensed Premises. It is understood and agreed that there are no agreements, conditions, warranties, terms, representations, oral or written, statutory or otherwise, other than those contained herein, and that all prior conversations, understandings, agreements, statements, communications or agreements, oral or written, with respect to this Agreement are hereby superseded.

Following execution of the License Agreement, Ultracuts continued to prepare for expansion into the western Canada Wal-Mart stores by expanding its staff, obtaining increased financing, enhancing its computer capabilities, and foregoing other development opportunities. Ultracuts communicated regularly with Wal-Mart officials, keeping them informed of the progress made by Ultracuts toward fulfilling its agreement.

On September 18, 1996, Ultracuts filed a complaint against Wal-Mart alleging breach of contract and fraud. Ultracuts amended its complaint on February 27, 1997, again alleging that Wal-Mart was in breach of the October 12, 1995 oral contract and had committed fraud against Ultracuts by concealing information concerning a conflicting agreement between Wal-Mart and Magicuts that prevented Wal-Mart from performing as promised under the Ultracuts Agreement. Ultracuts requested specific performance and damages. Wal-Mart denied the existence of a valid oral contract and denied the allegation of fraud.

Mel Redman, head of Wal-Mart's transition team in Canada, testified by deposition that in 1994 he entered into a contract with Magicuts, whereby Wal-Mart promised Magicuts the right of first refusal to license space for hair salons in Canadian Wal-Mart stores. Mr. Messer admitted that he was aware of the Magicuts agreement as early as November 1995, although Ultracuts alleges he knew of the conflicting agreement much earlier. His successor, Scott Robertson, acknowledged that he became aware of the Magicuts agreement as early as March 1996. Ultracuts has alleged that Wal-Mart committed fraud by withholding this information from it until after

Ultracuts expended considerable amounts of money in anticipation of obtaining licenses to operate inside Wal-Mart stores in western Canada, even though Wal-Mart was aware of Ultracuts' reliance on the Ultracuts Agreement.

On June 10, 1998, Wal-Mart filed a motion for summary judgment, asserting that there was no genuine issue of material fact before the trial court, and that the License Agreement's integration clause precluded Ultracuts' claim for breach of the alleged October 12, 1995 oral agreement. Subsequently, on October 16, 1998, Ultracuts filed a second amended complaint that again alleged breach of the October 12, 1995 oral agreement and fraud. In its second amended complaint, Ultracuts alleged for the first time that the oral agreement with Wal-Mart promised Ultracuts the right of first refusal to license *any* available space in Wal-Mart stores in western Canada, not just the right of first refusal to license available *hair salon* space. On October 29, 1998, Wal-Mart filed a motion to strike Ultracuts' second amended complaint.

In an order entered on March 2, 1999, the trial court granted Wal-Mart's motion for summary judgment and its motion to strike the second amended complaint. Specifically as to the second amended complaint, the trial court held that, although Wal-Mart had notice of and was not surprised by the new allegations, because the allegations were "significantly contradictory to other matter put in the record," the motion to strike was granted.

The trial court granted summary judgment as to the claim for breach of contract because: (1) the alleged contract was missing an essential term, namely the time frame in which Wal-Mart must decide whether to place hair salons in its western Canadian stores; (2) there had been no actual breach of the alleged contract; (3) anticipatory repudiation was not appropriate to the facts of the case; (4) the alleged contract violated the statute of frauds because it created an interest in property and was not reduced to writing; (5) the case was not taken out of the statute of frauds by detrimental reliance or substantial performance; (6) a subsequent written contract was a fully integrated document which subsumed the alleged oral contract; and (7) the alleged agreement violates the rule against perpetuities.

The trial court granted summary judgment as to the claim of fraud because (1) any reliance by Ultracuts on the alleged statements of the defendants was not reasonable and (2) the written "License Agreement" integrated all prior and contemporaneous agreements and statements, so no claim of fraud could survive.

Holding that genuine issues of material fact remain to be decided, the Arkansas Court of Appeals reversed the trial court's grant of summary judgment on all counts. *Ultracuts Ltd. v. Wal-Mart Stores*, 70 Ark. App. 169, 16 S.W.3d 265 (2000). The case is before us on petition for review; therefore, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(e).

■ "Summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law." *Wallace v. Broyles*, 331 Ark. 58, 66, 961 S.W.2d 712 (1998) (*Wallace I*) (citing *Pugh v. Griggs*, 327 Ark. 577, 824 S.W.2d 387 (1992)). The standard is whether the evidence is sufficient to raise a fact issue, not whether the evidence is sufficient to compel a conclusion. *Id.* (citing *Caplener v. Bluebonnet Milling Co.*, 322 Ark. 751, 911 S.W.2d 586 (1995)). A fact issue exists, even if the facts are not in dispute, if the facts "may result in differing conclusions as to whether the moving party is entitled to judgment as a matter of law. . . . [I]n such an instance, summary judgment is inappropriate." *Wallace v. Broyles*, 332 Ark. 189, 961 S.W.2d 712 (1998) (supplemental opinion denying rehearing) (*Wallace II*).

■ On review, this court determines if summary judgment was appropriate based on whether the evidence presented in support of summary judgment leaves a material question of fact unanswered. *Wallace I, supra.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Wallace I, supra.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.* (citing *Angle v. Alexander*, 328 Ark. 714, 945 S.W.2d 933 (1997)).

## I. Breach of Contract

■ "A person may be liable for breach of contract if the complaining party can prove the existence of an agreement, breach

of the agreement, and resulting damages." *Sexton Law Firm, P.a. v. Milligan*, 329 Ark. 285, 298, 948 S.W.2d 388, 395 (1997); *Rabalaias v. Barnett*, 284 Ark. 527, 683 S.W.2d 919 (1985). In the present case, the trial court held that the October 12, 1995 oral Ultracuts Agreement was subsumed by the January 22, 1996 written License Agreement. Consequently, Ultracuts failed to assert the breach of a valid and enforceable contract between Ultracuts and Wal-Mart. We agree.

■ "It is a general proposition of the common law that in the absence of fraud, accident or mistake, a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings and verbal agreements on the same subject." *Farmers Coop. Assoc. v. Garrison*, 248 Ark. 948, 454 S.W.2d 644 (1970). "This is simply the affirmative expression of the parol evidence rule." *Id*. Only where an ambiguity is found within the contract may parol evidence be admitted. *Rainey v. Travis*, 312 Ark. 460, 850 S.W.2d 839 (1993). It may not be admitted to alter, vary, or contradict the written contract, but it may be admitted to prove an independent, collateral fact about which the written contract was silent. *Id*.

■ Ultracuts alleged that Wal-Mart breached the October 12, 1995 oral Ultracuts Agreement that purportedly granted Ultracuts certain rights pertaining to the future licensing of available space in Wal-Mart stores in western Canada. On January 22, 1996, the two parties entered into a written "License Agreement" that included provisions pertaining to the future licensing of retail space within Wal-Mart stores in Canada. Ultracuts argues that the License Agreement does not contain the whole agreement between the parties, but merely pertains to the licensing of the four stores specified on the License Schedule. Although the License Agreement does provide for the contemporaneous licensing of space in four stores in western Canada, it is not limited to that purpose. The explicit language of the agreement clearly dictates the terms under which future licensing agreements between Wal-Mart and Ultracuts will be reached; that is, the agreement provides a framework within which Wal-Mart will grant Ultracuts licenses to operate hair care salons in its stores. Likewise, the term "Licensed Premise" is defined to apply to "those stores [sic] which a license schedule has been executed by the parties *from time to time*." (Emphasis added.) The language of the contract is unambiguous. It contains no agreement

to allow Ultracuts the right of first refusal to license available space, nor does it contain an agreement by Wal–Mart not to license space to competitors of Ultracuts within the same market. Even if these terms were part of a valid oral agreement between the parties prior to the License Agreement, all prior oral agreements relating to the process of Ultracuts licensing space in Wal–Mart stores were superseded by the written License Agreement. We will not resort to parol evidence to alter the terms of that agreement by enforcing portions of the oral agreement not incorporated into the written License Agreement.

■ ■ Ultracuts argues alternatively that parol evidence is admissible in this matter because fraud creates an exception to the parol evidence rule. Ultracuts further argues that fraud was alleged. "The rule of evidence forbidding the addition, alteration or contradiction of a written instrument by parol testimony of antecedent and contemporaneous negotiations does not apply where there is an issue of fraud in the procurement of the writing." *Hamburg Bank v. Jones*, 202 Ark. 622, 624, 151 S.W.2d 990 (1941). Thus, the fraud that must be alleged in order to avoid the parol evidence rule is fraud in the *procurement* of the contract. Ultracuts has not alleged that the January 22, 1996 License Agreement was procured by fraud. Rather, Ultracuts has alleged that Wal–Mart committed fraud when it failed to disclose to Ultracuts in a timely manner that it was unable to honor the Ultracuts Agreement, causing Ultracuts to expend large amounts of money in reliance upon the agreement. Ultracuts' allegation amounts to a separate tort claim of fraud. It did not plead an exception to the parol evidence rule. We therefore hold that the alleged oral agreement between Wal–Mart and Ultracuts merged into the subsequent written contract, rendering the October 12, 1995 oral agreement invalid and unenforceable. As a result, we affirm the trial court's grant of summary judgment on the claim of breach of contract.[1]

---

[1] We recognize that Ultracuts has raised several alternative arguments for the reversal of the summary judgment. However, because we have held that summary judgment was appropriately granted based upon the doctrine of merger, the alternative arguments for reversal become moot.

## II. Fraud

■ ■ Ultracuts next argues that the trial court erred by granting summary judgment on the claim of fraud because the question of whether Ultracuts reasonably relied upon the representations made by Wal-Mart was a question of fact that remains to be decided. Ultracuts alleged that Wal-Mart committed fraud when it failed to disclose to Ultracuts that it had a second contract precluding it from honoring its agreement to offer Ultracuts the right of first refusal to license space in all western Canadian Wal-Mart stores.

> The tort of fraud consists of five elements that the plaintiff must prove by a preponderance of the evidence: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Medlock v. Burden*, 321 Ark. 269, 273, 900 S.W.2d 552, 555 (1995). Further, if a respondent to a motion for summary judgment cannot present proof on an essential element of the claim, the movant is entitled to summary judgment as a matter of law. *O'Mara v. Dykema*, 328 Ark. 310, 316, 942 S.W.2d 854, 857 (1997).

*Golden Tee, Inc. v. Venture Golf Schools, Inc.*, 333 Ark. 253, 266, 969 S.W.2d 625 (1998).

The trial court granted summary judgment on the fraud claim because it found as a matter of law that any reliance by Ultracuts on the statements and promises made by Wal-Mart was not reasonable and that, because the alleged oral agreement was subsumed by the fully integrated License Agreement, no claim of fraud could survive merger.

For the reasons previously stated, we agree with the trial court that the Ultracuts Agreement no longer existed following the execution of the License Agreement on January 22, 1996. *See Farmers Coop. Assoc. v. Garrison, supra.* Accordingly, Ultracuts could not justifiably rely upon any representations by Wal-Mart following that date. However, genuine issues of fact remain to be decided regarding Ultracuts' fraud claim preceding the execution of the January 22, 1996 License Agreement.

Ultracuts alleged in its complaints that on October 12, 1995, Wal-Mart promised, in part, to offer any available license space in its stores in western Canada to Ultracuts before offering it to any other provider of hair care services. Ultracuts further claimed in its complaint that, in reliance upon Wal-Mart's representations, it obtained increased levels of financing, hired new staff, updated its computer systems to accommodate additional stores, ordered new equipment and trade fixtures for installation in the new stores, traveled extensively to examine new store premises, and refrained from other investment and expansion opportunities to preserve capital for the expansion into Wal-Mart. In response to Wal-Mart's motion for summary judgment, Ultracuts provided an affidavit from its president, Meril Rivard, and attached documents detailing the monetary expenditures Ultracuts claimed to have made in reliance upon Wal-Mart's representations. These documents contain numerous expenditures allegedly incurred by Ultracuts between October 12, 1995, and January 22, 1996. In connection with its fraud claim, Ultracuts also alleged that Mr. Messer knew about the conflicting agreement with Magicuts no later than November 1995; but, with full knowledge that Ultracuts was acting in reliance on Wal-Mart's assurances, he nevertheless failed to notify Ultracuts about the conflicting agreement, and he continued to tell Ultracuts in December 1995 that several store locations in western Canada would be available to Ultracuts.

Clearly, fact questions are presented that preclude summary judgment as to the fraud claim. The trial court erred when it held as a matter of law that Ultracuts' reliance was unreasonable and granted summary judgment accordingly. *See Van Dyke v. Glover*, 326 Ark. 736, 745, 934 S.W.2d 204 (1996). We therefore reverse the grant of summary judgment as to the claim of fraud to the extent that Ultracuts may have relied upon representations made by Wal-Mart prior to execution of the January 22, 1996 License Agreement.

### III. Motion to Strike

Ultracuts also appeals from the order of the trial court granting Wal-Mart's motion to strike its second amended complaint. The trial court found that Wal-Mart had not been surprised by the allegations contained in the second amended complaint and made

no finding of other prejudice. The trial court ordered the pleading stricken anyway because it contained terms inconsistent with previous pleadings.

"[A] party may amend his pleadings at any time without leave of the court. Where, however, upon motion of an opposing party, the court determines that prejudice would result or the disposition of the cause would be unduly delayed because of the filing of an amendment, the court may strike such amended pleading or grant a continuance of the proceeding." Ark. R. Civ. P. 15(a). A trial court is vested with broad discretion in allowing or denying amendment to pleadings. *Stoltz v. Friday*, 325 Ark. 399, 926 S.W.2d 438 (1996). However, "a party should be allowed to amend a pleading at any time as long as it does not prejudice his adversary." *Milne v. Milne*, 266 Ark. 900, 587 S.W.2d 229 (1979). A trial court abuses its discretion if it strikes an amended pleading in the absence of prejudice to the opposing party. *Webb v. Workers' Compensation Comm'n*, 286 Ark. 399, 692 S.W.2d 233 (1985). In the instant case, the trial court made no finding of prejudice, but ordered the complaint stricken anyway. This was an abuse of discretion. *Webb v. Workers' Comp. Comm'n, supra.* We therefore reverse the trial court's order striking the second amended complaint filed by Ultracuts.

Affirmed in part; reversed and remanded in part.

CORBIN, J., not participating.